## JAFFA v SHACKET

Docket No. 51043. Submitted December 1, 1981, at Lansing.—Decided April 5, 1982.

Al A. Shacket, Leroy Helfman and James G. Hartrick formed a corporation which became known as Hulett, Inc., to deal in interests in real estate. Shacket, Helfman and Hartrick signed an agreement for development of land whereby Shacket and Helfman were to acquire purchase agreements with the right to assign them to Hartrick or Hulett. Hartrick was to furnish the money for this and Shacket and Helfman were to pay expenses for design, engineering and zoning of the property in order to develop it as a mobile-home park. The agreement further provided that the property could be sold only to Shacket and Helfman for a specified period, unless they agreed otherwise. The buy-back price was set at $3,800 per acre, unless Hartrick agreed to less. Furthermore, Hartrick was to reimburse Shacket and Helfman for development costs if resale brought Hartrick a profit of at least $1,000 per acre. A second venture, Stay Company, a partnership consisting of Shacket, Helfman, Harold S. Jaffa, and Irving Taran was formed, dealing with development of the same property as that involved in the Shacket and Helfman agreement with Hulett. Under the partnership agreement, Shacket and Helfman were to transfer the land to the partnership "at their cost". In addition, both were to contribute $12,500, Jaffa and Taran were to give $25,500 each in cash and to loan $155,000 to the partnership. Shacket and Helfman acquired options to purchase three real estate parcels, which together formed a 145-acre parcel. These

REFERENCES FOR POINTS IN HEADNOTES

[1] 4 Am Jur 2d, Appeal and Error § 156.

5 Am Jur 2d, Arbitration and Award §§ 29, 127, 142, 146, 147, 167.

Power of arbitrator to correct, or power of court to correct or resubmit, non-labor award because of incompleteness or failure to pass on all matters submitted. 36 ALR3d 939.

[2] 66 Am Jur 2d, Release § 30.

[3] 60 Am Jur 2d, Partnership § 123.

[4] 37 Am Jur 2d, Fraud and Deceit § 12.

[5] 5 Am Jur 2d, Arbitration and Award § 187.

options were assigned to Hulett for $1 each and closings on the options occurred from August through October 1969. The total purchase price for the entire parcel was $260,500. Before Hulett closed on these properties, Shacket and Helfman, acting pursuant to the agreement, offered to buy the entire parcel for $525,000. Shacket and Helfman assigned their interest to Stay and a land contract for the 145-acre parcel was executed. Payments were made under the land contract and a 55-acre parcel was transferred to Stay as payments were complete. This property was mortgaged to acquire funds for another development and was forfeited after Stay Company encountered financial difficulties in the 1970s. While payments were made on the remaining property, those payments were forfeited to Hulett when Stay defaulted on land contract payments after Jaffa and Taran accused Shacket and Helfman of fraud. The parties then signed an agreement in an attempt to settle their disputes. The agreement afforded Jaffa and Taran an opportunity to buy out Shacket and Helfman's interest in the partnership. If they failed to act by a certain date, Shacket and Helfman could purchase Jaffa's and Taran's interests. The agreement also included a release clause that was to be effective "upon execution". Neither party exercised the option to purchase and Jaffa and Taran brought an action in the Oakland Circuit Court against Shacket, Helfman, Hartrick and Hulett, Inc., and, by agreement of the parties, the case was submitted to arbitration. The arbitration agreement provided for judicial review of both the law and the facts. At the arbitration hearing certain evidence concerning another real estate transaction was introduced to show defendant's scheme or plan. The arbitrator held Shacket and Helfman liable and awarded damages consisting of four parts: (1) the inflated price used to purchase 55 acres of the 145-acre parcel, $100,289.75; (2) the "development costs" paid to Shacket and Helfman by Hartrick and Hulett, $84,000; (3) the amount paid for the remaining 90 acres in the 145-acre parcel, $64,900; and (4) reimbursement for option prices on the unrelated transaction, $8,000. The circuit court affirmed the award, Hilda R. Gage, J., and Shacket and Helfman appealed. *Held:*

1. An arbitrator's findings of fact must be treated as final unless found to be in manifest disregard of the evidence even though the arbitration agreement indicated the intention of the parties to be to provide for judicial review of both the arbitrator's findings of fact and conclusions of law.

2. The arbitrator did not manifestly err in holding the exercise of one of the buy-out options in the agreement to

attempt settlement to be a condition precedent to the operation of the release clause of that agreement.

3. Partners have a duty to render true and full information of all things affecting the partnership to any partner on demand. It is a breach of that duty to provide incomplete disclosure even where there is no concealment of personal profit. The arbitrator did not err in finding fraud on the part of Shacket and Helfman.

4. The award of the development costs as a separate element of damages was error because it allowed plaintiffs a double recovery.

5. It was error for the arbitrator to consider in computing damages evidence which was introduced to show a scheme or plan, not to prove damages.

Affirmed in part, reversed in part and remanded with instructions.

1. ARBITRATION — APPEAL — FINDINGS OF FACT.

An arbitrator's findings of fact should be treated as final unless found to be in manifest disregard of the evidence even where the arbitration agreement indicates the intention of the parties to be to provide for judicial review of both the arbitrator's findings of fact and conclusions of law.

2. RELEASE — SCOPE OF RELEASE.

The scope of a release is governed by the intent of the parties as expressed in the terms of the release.

3. PARTNERSHIP — DISCLOSURE — UNIFORM PARTNERSHIP ACT.

Partners have a duty to render true and full information of all things affecting the partnership to any partner on demand; it is a breach of that duty to provide incomplete disclosure even where there is no concealment of personal profit (MCL 449.20; MSA 20.20).

4. FRAUD — FRAUDULENT MISREPRESENTATION — FRAUDULENT CONCEALMENT.

The elements of fraudulent misrepresentation are 1) a false representation by the defendant, 2) knowledge or belief on the part of the defendant that the representation is false, 3) an intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation, 4) justifiable reliance upon the misrepresentation on the part of the plaintiff, and 5) damage to the plaintiff resulting from such reliance; the false material representation needed to establish fraud may be satis-

fied by the failure to divulge a fact or facts the defendant has a
duty to disclose.

5. DAMAGES — EVIDENCE.
    It is error for an arbitrator to consider in computing damages
    evidence which was introduced to show a scheme or plan, not
    to prove damages.

*Levin, Levin, Garvett & Dill* (by *Wallace K.
Sagendorph*), for plaintiffs.

*Schwartz, Knauer, VanderKloot & Abrams*, for
defendants Shacket and Helfman.

Before: V. J. BRENNAN, P.J., and ALLEN and
T. C. MEGARGLE,* JJ.

ALLEN, J. This case involves a real estate devel-
opment scheme gone sour. Defendants Al Shacket
and Leroy Helfman arranged to purchase a parcel
of land in Meridian Township through a land
banking arrangement with James G. Hartrick.
Shacket and Helfman later entered into a partner-
ship with plaintiffs, Harold Jaffa and Irving Taran,
and the partnership purchased the property from
Hartrick's corporation, Hulett, Inc. Plaintiffs claim
that Shacket and Helfman concealed their prior
arrangements with Hulett, Inc., and inflated the
price of the property, in violation of their fiduciary
relationship to the partnership and with an intent
to defraud plaintiffs.

On July 25, 1975, plaintiffs filed suit against the
three men and Hulett and the case was assigned
to then-Oakland County Circuit Court Judge Wil-
liam P. Hampton. The parties agreed to arbitra-
tion and selected Judge Hampton, who had then
left the bench, as arbitrator. In February 1980, the
arbitrator found Shacket and Helfman, but not

* Circuit judge, sitting on the Court of Appeals by assignment.

Hulett or Hartrick, liable for $257,189.75. This award was confirmed by the Oakland County Circuit Court and defendants Shacket and Helfman now appeal as of right, challenging the arbitrator's decision on both fact and law.

## I. THE FACTS.

Two business ventures are involved in this dispute. The first is a corporation formed in 1967 "to acquire, own, use, convey and otherwise dispose and deal with or in real property or any interest". Initially known as Geney, Inc., the business later became known as Hulett, Inc. Throughout this opinion, the venture will be referred to as Hulett. Hulett's president during most relevant times was Hartrick.

On November 8, 1967, Shacket, Helfman and Hartrick signed an agreement for development of land. As part of this agreement, Shacket and Helfman were to acquire purchase agreements with the right to assign them to Hartrick or Hulett. Hartrick was to furnish the money for this and Shacket and Helfman were to pay expenses for design, engineering and zoning of the property in order to develop it as a mobile-home park. The agreement further provided that the property could be sold only to Shacket and Helfman, unless they agreed otherwise, until November 8, 1967. The buy-back price was set at $3,800 per acre, unless Hartrick agreed to less. Furthermore, Hartrick was to reimburse Shacket and Helfman for development costs if resale brought Hartrick a profit of at least $1,000 per acre.

The second venture is Stay Company, a partnership consisting of Shacket, Helfman, Jaffa, and

Taran. Discussion about forming a partnership to develop a mobile-home park began in the summer of 1969 and the partnership agreement was signed September 16, 1969. The park was to be on the same property involved in the Shacket and Helfman agreement with Hulett.

Under the partnership agreement, Shacket and Helfman were to transfer the land to the partnership "at their cost". In addition, both were to contribute $12,000. Jaffa and Taran were each to give $25,500 in cash and to loan $155,000 to the partnership.

The parties disagreed about whether Jaffa and Taran were informed of the 1967 agreement of Shacket, Helfman and Hartrick. The arbitrator found that there was no such disclosure before the formation of Stay Company and that Jaffa and Taran did not learn of the agreement until late 1973. The arbitrator further found that Hartrick was informed that a disclosure had been made.

From 1967 through 1969, Shacket and Helfman acquired options to purchase three real estate parcels, which together formed the 145-acre parcel that is the subject of the dispute. These options were assigned to Hulett for $1 each and closings on the options occurred from August through October 1969. The total purchase price for the entire parcel was $260,500.

Before Hulett closed on these properties, Shacket and Helfman, acting pursuant to the 1967 agreement, offered to buy the entire parcel for $525,000. The offer to purchase was dated July 15, 1969. Shacket and Helfman assigned their interest to Stay on September 16, 1969, and a land contract

for the 145-acre parcel was executed October 7, 1969.

Payments were made under the land contract and a 55-acre parcel was transferred to Stay as payments were complete. This property was mortgaged to acquire funds for another development and was forfeited after Stay Company encountered financial difficulties in the 1970s. While payments were made on the remaining property, those payments were forfeited to Hulett when Stay defaulted on land contract payments after plaintiffs accused Shacket and Helfman of fraud.

In 1970, Stay attempted to acquire an additional parcel of land near the 145-acre parcel. This land, owned by Derwood Dickinson, was the subject of an offer to purchase by Shacket and Helfman. Shacket and Helfman informed their broker that they wished to purchase the property in the name of an associate, Donald White, for tax reasons, and another offer to purchase was drawn up and accepted. The purchase price of that additional parcel was to be $2,600 per acre.

Stay offered to purchase this land from White for a higher price and at a higher interest rate. Sale of this property was never consummated and plaintiffs stated at the arbitration hearing that they were not seeking damages from this transaction.

Plaintiffs learned of Shacket and Helfman's original offer to purchase the Dickinson land. Their subsequent investigation revealed Shacket and Helfman's actions in acquiring the options on the 145-acre parcel and plaintiffs initiated these proceedings.

On August 2, 1974, the parties signed an agreement in an attempt to settle their disputes. The agreement afforded plaintiffs an opportunity to buy out Shacket and Helfman's interest in the partnership. If plaintiffs failed to act by September 9, 1974, Shacket and Helfman could purchase plaintiffs' interest.

The agreement also included a release clause that was to be effective "upon execution".

Neither party exercised the option to purchase and plaintiffs proceeded with this suit, which was submitted to arbitration.

## II. SCOPE OF REVIEW.

Initially, we must determine what scope of review is appropriate. The arbitration agreement was an unusual one and was designed to permit former judge Hampton to act as a "private judge". The agreement provided that for the purposes of the controversy, the arbitrator possessed "all powers possessed by a Circuit Court Judge for the State of Michigan, sitting as a Judge of law and facts". The agreement further stated that the arbitrator was to be governed by the statutes, court rules and substantive, procedural and evidentiary law of Michigan and that no decision at variance with the law was to be entered. Review of the award was to be pursuant to GCR 1963, 769.9 "except for the last sentence of 769.9(1)" and the provisions as to the powers of the arbitrator.

The court rule, including its last sentence, states:

"Upon application of a party, the court shall vacate an award where:

"(a) The award was procured by corruption, fraud or other undue means;

"(b) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

"(c) The arbitrators exceeded their powers; or

"(d) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing as to prejudice substantially the rights of a party.

"But the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award."

Plaintiffs and defendants indicated at the arbitration hearings that they intended by this agreement to hire a private judge who would make findings of fact and conclusions of law that were reviewable.

Generally, an agreement to submit a dispute to arbitration involves a pledge to abide by the arbitrator's decision. Under an arbitration agreement that does not provide otherwise, it is understood that the arbitrator's errors of fact or misinterpretation of the law are not generally grounds for setting aside the award. *DAIIE v McMillan,* 97 Mich App 687, 691; 296 NW2d 147 (1980), *Ferndale Education Ass'n v School Dist for City of Ferndale,* 67 Mich App 637; 242 NW2d 478 (1976). If, however, the arbitrator exceeded his powers by acting arbitrarily or manifestly disregarding the law, a reviewing court may set aside the award. *McMillan, supra, DAIIE v Spafford,* 76 Mich App 85, 87; 255 NW2d 780 (1977).

An exception to this general rule has been recognized, however, in *North American Steel Corp v Siderius, Inc,* 75 Mich App 391; 254 NW2d 899 (1977). There, where the parties agreed that the arbitrator was required to follow the Uniform Commercial Code, the scope of judicial review included an examination of the award to determine whether it conformed to the code.

The *Siderius* exception formed a model for the parties drafting this arbitration agreement. Rather than limiting review to errors of law, however, the parties herein indicated an intent to have the award reviewed for errors of both fact and law. We do not believe that this expanded review is appropriate in this case.

An arbitration agreement is a contract and the arbitrator derives all his powers from the contract itself. *Acme Cut Stone Co v New Center Development Corp,* 281 Mich 32; 274 NW 700 (1937). The contract to arbitrate in this case required the arbitrator to follow applicable law and review of the arbitrator's award may therefore include an examination of the law to determine whether the arbitrator did not follow the terms of the agreement as to the law. *Siderius, supra.*

The arbitration agreement does not, however, define the powers of a court of law. The expanded judicial review in *Siderius* was possible not because the parties attempted to expand the court's power but because the parties intended to and did limit the arbitrator's power. The reviewing court therefore performed the traditional role of examining the award to determine if the arbitrator acted within his powers. We therefore believe that our duty is to review the arbitrator's findings, treating all facts as final unless found in manifest disregard of the evidence, while we must review the

conclusions of law to determine whether they are in conformity with the law.

## III. Release Clause.

The defendants contend the release clause of the August 2, 1974, agreement bars this suit. That clause states:

"By execution of this Agreement each of the parties hereby releases and forever discharges the other of them, his heirs, executors, administrators, attorneys and assigns, from all actions, proceedings, claims or demands whatsoever, which said respective releasing party, or his heirs, executors, administrators or assigns, now has or hereafter might have had against the other of them, his heirs, executors, administrators, attorneys or assigns, including withdrawal of complaints submitted to the Oakland County Prosecuting Attorney, on account of the partnership or anything relating thereto, but so nevertheless that this present release shall not prejudice or affect any of the covenants, agreements or provisions herein contained, or the rights or remedies of the respective parties, their heirs, executors, administrators or assigns, hereunder."

The arbitrator indicated during hearings that the release clause appeared to be contrary to the remaining provisions of the agreement and he considered parol evidence as to the parties' intent in signing this agreement. Defendant Helfman indicated he believed the agreement would put to rest all disputes about the partnership, regardless of whether the buy-out options were exercised.

Taran stated he did not know what the release was meant to do.

The arbitrator found that the agreement was never performed and did not release Shacket and Helfman from liability.

We now must determine whether Michigan law permits the arbitrator to construe the release as operative upon a condition precedent, the exercise of one of the buy-out options.

The scope of a release is governed by the intent of the parties as it is expressed in the release. *Grzebik v Kerr,* 91 Mich App 482, 486; 283 NW2d 654 (1979). The arbitrator found that the parties intended the buy-out options to be a condition precedent to the release.

Defendants correctly recognize that courts are disinclined to find conditions precedent in contracts. In *MacDonald v Perry,* 342 Mich 578, 586; 70 NW2d 721 (1955), the Supreme Court stated:

"[C]ourts are disinclined to construe the stipulations of a contract as conditions precedent, unless compelled by the language of the contract plainly expressed. The reason of this disinclination is that such a construction prevents the court from dealing out justice to the parties according to the equities of the case."

We believe that the arbitrator could properly find that the equities of this case demand that the exercise of the buy-out agreement be construed as a condition precedent to the release. This construction eliminates the conflict arising from an agreement that certain options exist which may be exercised in the future and a present release of all claims, regardless of whether the options are exercised. While the release clause, read alone, suggests it was intended to operate upon the signing of the agreement, when the clause is examined in the context of the entire agreement, it is difficult to believe that plaintiffs would knowingly and willingly release all claims against defendants even if none of the buy-out provisions were exercised. As the determination of the parties' inten-

tions is a question of fact, and finding no manifest error in the arbitrator's determination that the parties intended the release clause to be effective only upon exercise of one of the buy-out options, we accept the arbitrator's finding.

Accordingly, we find that the release was not intended to be effective until one of the parties exercised the buy-out option. As neither party elected to do so, the release was ineffective and does not bar this action.

## IV. FINDING OF FRAUD.

Defendants also claim the arbitrator erred in finding that defendants committed fraud and breached the partnership agreement when they transferred the 145-acre parcel to the partnership at the inflated post-land bank price. Defendants' impassioned challenge notwithstanding, we must accept as true the arbitrator's finding that defendants did not disclose their prior arrangement whereby Hartrick, acting through Hulett, acted as land banker. This finding is amply supported by plaintiffs' testimony which the arbitrator found to be credible. The minor inconsistencies, which were to be expected in the lengthy proceedings and extensive depositions, do not invalidate the finding.

In determining whether this failure to disclose constituted fraud or breach of the partnership agreement, it is necessary to examine the partnership agreement itself. By those terms, plaintiffs were to contribute cash and defendants a smaller sum, plus the 145-acre land parcel "at their cost". Defendants argue strenuously that they fully complied with the agreement and did not engage in fraud when they conveyed the land to the partner-

ship at the post-land bank cost of $525,000 rather than the original acquisition price of $260,500.

Had plaintiffs and defendants been negotiating at arm's length, it is possible that the phrase "at their cost" could be subject to the meaning defendants suggest. Defendants and plaintiffs here, however, were entering into a partnership agreement and defendants had a duty under the Michigan Uniform Partnership Act to "render on demand true and full information of all things affecting the partnership to any partner". MCL 449.20; MSA 20.20.

The arbitrator found that defendants breached this duty in failing to disclose the prior relationship with Hartrick. We believe this conclusion was a correct application of the law.

Defendants argue, however, that they fully complied with the partnership act because they made no profit in charging the partnership a higher price than they had agreed to pay the original owners under the options to purchase. While the arbitrator did not find specifically that defendants made a profit on the transaction, the arbitrator did find that defendants' purpose in increasing the price was "so that an extra profit could be made by Hulett, Hartrick, Shacket and Helfman". The arbitrator also found that Shacket and Helfman concealed their prior dealings to increase the price "so that Shacket and Helfman could derive proceeds from the sale".

Furthermore, we decline to accept defendants' theory that there is no violation of a partner's fiduciary duty to the partnership when there is incomplete disclosure of information, so long as

there is no concealment of profit. In using the word "information" in § 20 of the act, the Legislature intended to include all relevant information regardless of whether that information related to profit. Had the drafters intended to require only disclosure of "profit", they could have used that narrower term, as they did in § 21 of the act, which requires a partner to account for "any profits derived by him". Under § 20, however, the partner's duty to render information is more broadly stated.

Other states have broadly interpreted the language of § 20 of the Uniform Partnership Act. California courts have recognized a duty to disclose "matters affecting the business relationship" and found a breach when one partner neglected to disclose a prior issuance of stock. *Berg v King-Cola, Inc,* 227 Cal App 2d 338; 38 Cal Rptr 655 (1964). Similarly Maryland courts have recognized "the obligation of each member of the partnership to make full disclosure of all known information that is significant and materal to the affairs or property of the partnership". *Herring v Offutt,* 266 Md 593, 597; 295 A2d 876, 879 (1972). We believe that the prior relationship of Hartrick with Shacket and Helfman was a matter such that failure to disclose it constituted a breach of the partnership duties.

The arbitrator also found that defendants Shacket and Helfman had committed fraud in promising to convey the property "at their cost", but in conveying it at the inflated post-land bank price. The elements of fraud are:

"(1) a material representation which is false; (2) known by defendant to be false, or made recklessly

without knowledge of its truth or falsity; (3) that defendant intended plaintiff to rely upon the representation; (4) that, in fact, plaintiff acted in reliance upon it; and (5) thereby suffered injury. *Hyma v Lee,* 338 Mich 31, 37; 60 NW2d 920 (1953). * * * The false material representation needed to establish fraud may be satisfied by the failure to divulge a fact or facts the defendant has a duty to disclose. Such an action is one of fraudulent concealment." *Fassihi v Sommers, Schwartz, Silver, Schwartz & Tyler, PC,* 107 Mich App 509, 517; 309 NW2d 645 (1981).

The evidence supporting the arbitrator's finding of fraud is ample. Defendants admit agreeing to convey "at their cost", and conveying at the higher value. As defendants had a duty to disclose the true initial cost and did not do so, the first element is satisfied. There is little question that the remaining elements of fraud have been established. While the extent of plaintiffs' injury is disputed, the fact of injury is clear: plaintiffs were led to pay nearly twice the cost of the property through defendants' concealment. The fact that defendants themselves may not have "profited" by retaining the difference in cost is of no moment. *Hyma v Lee, supra,* 37.

We find no error in the arbitrator's conclusion that defendants breached their duty to disclose and defrauded plaintiffs.

## V. DAMAGES.

Finally, defendants contend that even if fraud or a breach of fiduciary duty did occur, the arbitrator erred in making its determination of damages. The arbitrator determined that there were four elements of damages: (1) the inflated price used to purchase 55 acres of the 145-acre parcel, $100,289.75; (2) the "development costs" paid to

Shacket and Helfman by Hartrick and Hulett, $84,000; (3) the amount paid for the remaining 90 acres in the 145-acre parcel, $64,900; and (4) reimbursement for option prices on the Donald E. White offer, $8,000.

The total damages found by the arbitrator were $257,189.75, the sum of the four mentioned elements.

Defendants contend that the method of computation gave plaintiffs more than their actual damages. We have carefully examined the arbitrator's computation and the record and we agree in part.

The first element of damages was accurately computed and compensated plaintiffs for only the increase in price of 55 acres actually purchased due to the land banking arrangement. This element of damages was allowable.

The third element of damages compensated plaintiffs for their losses on the remaining 90 acres. This loss, engendered after plaintiffs discovered the land banking scheme, also is fully compensable.

The two computations together, however, constitute the full amount allowable. Element two of the damages, the development costs, was paid to defendants out of sums Hulett, Inc., received from plaintiffs and defendants under the payments for the land. To allow plaintiffs to recover both the payments and the development costs would doubly punish defendants.

Finally, we do not believe plaintiffs are entitled to recover $8,000 for the Donald White options. Plaintiffs' attorney, in introducing the White

scheme, stated that evidence of the scheme was being admitted to show a plan, not to prove any damages. We therefore believe the arbitrator clearly erred in his determination of damages. Plaintiffs were entitled only to such damages as would fully compensate them for their losses. As the award clearly exceeded the loss, it must be recomputed. Accordingly, total damages as found by the arbitrator should be reduced by $92,000 (the sum of elements 2 and 4 above), for a total of $165,189.75 damages.

Affirmed in part, reversed in part and remanded for an entry of damages in accordance with this opinion. No costs, neither party having prevailed in full.